UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 06-40 (JMR/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Arnold Fredrick Baker, | |
| Defendant. | |

LeeAnn K. Bell, Assistant United States Attorney, for the Government.
Peter B. Wold, for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 9, 2006, on Defendant's Motion to quash arrest [#17]. Although called a "motion to quash arrest" Defense counsel clarified at the hearing that the relief sought by this motion is suppression of the evidence that was seized at the time of Defendant's arrest. The Court will treat this motion as a motion to suppress the fruits of the <u>Terry</u> stop that led to Defendant's arrest. Defendant also filed a motion to suppress confessions or statements in the nature of confessions [#22]. At the hearing, the Court received testimony from Minneapolis Police Officer Douglas E. Dubay. Neither party submitted any exhibits during the course of the hearing. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendant's Motions be **GRANTED**.

## I.   FINDINGS OF FACT

Minneapolis Police Officer Douglas E. Dubay testified at the March 9, 2006, suppression hearing on this matter. Officer Dubay testified that he is a Minneapolis Police Officer, and has been so employed for over thirteen years. Officer Dubay testified that he works in the downtown beat,

and has been assigned to this beat since 1998.

On December 7, 2005, at approximately five in the evening, Officer Dubay heard a dispatch report that a 9-1-1 call had been received stating that an individual in the area of the Hiawatha Light Rail Station at Fifth Street and Nicollet Mall was seen carrying a firearm. The 9-1-1 caller identified the suspect carrying the firearm as an Indian male who was dressed in a black leather trench coat and was wearing a hair net.

In response to the dispatch report, Officer Dubay testified that he searched the area identified by the 9-1-1 caller. Officer Dubay testified that no suspect matching the description, carrying a firearm, was discovered on December 7, 2005.

The next day, December 8, 2005, Officer Dubay testified that he was working the downtown beat with his partner, Officer Subject. Officer Dubay testified that, at approximately 12:20 p.m., he and his partner were driving in the area of Sixth Street and Hennepin Avenue, in downtown Minneapolis. Officer Dubay testified that at the time he was on patrol, he was in a marked squad car and both he and his partner were in uniform. Officer Dubay stated that Officer Subject was driving the squad car, and that he was seated in the passenger seat. Officer Dubay testified that Officer Subject pointed out an individual on the southwest corner of Sixth Street and Hennepin Avenue who he believed matched the description of the suspect that was described by dispatch on December 7, 2005. Officer Dubay testified that he believed they had found the suspect at the corner of Sixth Street and Hennepin Avenue, standing in front of the Borders bookstore. Officer Dubay testified that he believed that the individual Officer Subject pointed out was the suspect they were looking for on December 7, 2005.

Although the individual the police officers saw was African-American, Officer Dubay

testified he believed the man fit the description because he was "possibly of mixed race" and was wearing a hair net and a black jacket. Officer Dubay further testified that, in his seven years working the downtown beat, he had never seen a person wearing a hairnet downtown. Officer Dubay identified Defendant as the individual standing on the corner outside of Borders bookstore at Hennepin Avenue and Sixth Street.

Officer Dubay testified that Officer Subject stopped the squad car near the entrance to the Borders bookstore. Officer Dubay testified that Defendant was standing with four other individuals at the time. Officer Dubay testified that he noticed Defendant was looking at him with what he described as a worried look on Defendant's face, "like uh-oh." Both officers then exited the vehicle, at which point Defendant turned and walked quickly northbound and entered the Borders bookstore. The four other individuals who were standing with Defendant followed him into the bookstore.

Officer Dubay testified that he and Officer Subject followed Defendant into the bookstore. Officer Dubay testified that as he entered the bookstore he saw Defendant looking at him above the bookshelves. At that time Defendant was located in the center of the bookstore, near the steps that led up to the skyway level. Officer Dubay testified that Officer Subject circled to the right, while he circled to the left, and that each officer met at the stairwell on each side of the Defendant's position. Officer Dubay testified that he immediately placed Defendant in handcuffs because he believed that Defendant was carrying a firearm, based on the December 7, 2005, dispatch report. Officer Dubay testified that he handcuffed Defendant for his and Officer Subject's safety, as well as the safety of the public, since Borders bookstore is a public location which, at the time, was open to the public for business.

Officer Dubay testified that Defendant asked him why he was stopped, and the Officer

Dubay responded that Defendant matched the description of a person who was reported to have been carrying a firearm on December 7. Officer Dubay then asked Defendant whether he was carrying a firearm. Officer Dubay testified that Defendant looked down toward his right side pocket area and then responded that he was carrying a firearm, but was doing so for a friend. At that point Officer Dubay lifted up Defendant's shirt and observed a silver and black Smith and Wesson nine millimeter handgun in the right side of Defendant's waistband between his jeans and his belt. Officer Dubay removed the firearm from Defendant's waistband, and removed the magazine. Officer Dubay testified that he asked Defendant whether he had a permit for the firearm, and Defendant responded that he did not have a permit to carry the firearm. Officer Dubay then asked Defendant if he had ever been convicted of a felony, and Defendant responded that he had been convicted of a felony. Defendant also made another statement to the effect that he would be going to prison for five years and that it was stupid for him to have a gun.

After Defendant made these statement, he was escorted to the squad car by Officer Dubay. Officer Dubay placed Defendant in the back of the squad car. Officer Dubay testified that he did not engage in any conversation with Defendant while in the squad car, and that no one else was present in the squad car other than himself and Defendant. Officer Dubay testified that, while he was in the squad car, Defendant said that he has a lot of enemies downtown and that he carried the firearm for protection.

On December 9, 2005, Defendant made a tape recorded statement while in the custody of the Minneapolis Police Department. The Government did not offer any evidence surrounding the circumstances of this statement, and has represented that it does not intend to offer this statement as evidence at trial.

Defendant now moves to suppress all evidence seized pursuant to his arrest [#17]. Defendant also moves to suppress all three sets of statements he made in connection with this incident [#22]; the statements made inside Borders, the statement in the squad car and the tape recorded statement. For the reasons which follow, the Court recommends that Defendant's motions be granted.

## II.   LEGAL ANALYSIS

The present case presents the Court with the question of whether Officer Dubay's initial stop and subsequent search of Defendant was valid under the Fourth Amendment. In order to answer this question, it is important to review the United States Supreme Court holdings concerning Terry stops and anonymous informants.

### A.   Investigative Detention

In Terry v. Ohio, 392 U.S. 1 (1968) the Supreme Court held:

> [w]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Id. at 30. This holding permits law enforcement to make an investigatory stop of an individual without a warrant when the law enforcement officer has reasonable articulable suspicion that criminal activity may be afoot. Id. at 25-31. When reviewing a Terry stop, the central inquiry for the Court is whether the law enforcement officials had reasonable, articulable suspicion that criminal activity was afoot at the time the Terry stop was initiated. See Florida v. J.L., 529 U.S. 266, 271 (2000)("[t]he reasonableness of official suspicion must be measured by what the officers knew

before they conducted their search.").

Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, [however,] the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In order to establish reasonable suspicion, an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). One way an officer might establish the existence of reasonable suspicion is through the use of tips received by informants.

### B.     An Informant's Tip Must Possess Sufficient Indicia of Reliability In Order to Provide Reasonable, Articulable Suspicion to Support a Terry Stop.

In Adams v. Williams, 407 U.S. 143 (1972) the United States Supreme Court held that a Terry stop and frisk was valid where it was commenced based on a tip provided by a known informant, in person, who had provided information in the past. The Court concluded that the information provided by the known informant carried sufficient "indicia of reliability" to justify a forcible stop, but that the same unverified tip may have been insufficient to support an arrest or a search warrant. Id. at 147.

In Illinois v. Gates, 462 U.S. 213 (1983) the Supreme Court was faced with the use of a partially corroborated anonymous informant's tip to provide probable cause for the issuance of a search warrant. The Court concluded that the totality of the circumstances analysis was the best standard to use in order to determine whether an anonymous tip provides probable cause. The Supreme Court noted that the previous test, the two-pronged test that focused on an independent analysis of the informant's reliability or veracity and his basis of knowledge, was subsumed within

6

the totality of the circumstances analysis, because "these two elements . . . are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id. at 233.

In Alabama v. White, 496 U.S. 325 (1990), the United States Supreme Court applied the Gates analysis to a Terry stop. In White the police received an anonymous tip claiming that a woman would leave an apartment building at a specific time, that she would get into a car matching a particular description, that she would drive to a named motel, and that she would be carrying cocaine. Id. at 327. The White Court held that this anonymous tip, on its own, would not be sufficient to justify a Terry stop. Id. at 329. The White Court noted that

> [r]easonable suspicion, like probable cause, is dependent upon both the content of the information possessed by police and its degree of reliability. . . . Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates* Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established.

Id. at 330-31. The White Court held that, only after the police observed that the informant in White had accurately predicted the woman's movements did it become reasonable for officers to think that the anonymous informant had inside knowledge about the suspect. Id. at 332. Only after these observations was it reasonable for the officers to credit the informant's assertion about the presence of cocaine on the woman. Id. The White Court explicitly stated that this fact situation presented a "close case." The Court ultimately concluded that "under the totality of the circumstances the

anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify" the Terry stop. Id.

    **C.**    **Officers Dubay and Subject Did Not Have Reasonable, Articulable Suspicion That Criminal Activity Was Afoot When They Stopped Defendant in Borders Bookstore.**

The present case is almost indistinguishable from Florida v. J.L., 529 U.S. 266 (2000). In J.L., an anonymous caller reported to the police department that there was a young black male wearing a plaid shirt who was standing at a particular bus stop and was carrying a gun. Id. at 268. At some later point two officers were instructed to respond to the location of the bus stop in order to investigate the call. Id. When they arrived at the bus stop the officers saw three young black men standing at the bus stop, one of whom was wearing a plaid shirt. Id. Aside from the anonymous tip, the officers had no reason to suspect any of the three men of involvement with illegal activity. Id. The officers did not see a firearm nor did the defendant, J.L., make any "threatening or otherwise unusual movements." Id. One of the officers "approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." Id.

> Beginning its analysis, the Supreme Court stated
> 
> In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . however, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop. . . . The question we here confront is whether the tip pointing to J.L. had those indicia of reliability.

Id. at 270 (internal citations and quotations omitted). In order to determine whether the tip had sufficient indicia of reliability to provide the officers with reasonable suspicion to make the

investigatory stop of J.L., the Supreme Court analyzed its holding in <u>Alabama v. White</u>, 469 U.S. 325 (1990).  Reviewing the decision in <u>White</u>, the Court in <u>J.L.</u> noted that

> the tip in the instant case lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case.  The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.  That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct . . . All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.  If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

<u>Florida v. J.L.</u>, 529 U.S. at 271.  The Supreme Court concluded that the search was invalid under the Fourth Amendment, stating

> We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue . . . we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams* and *White* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.

<u>Id</u>. at 274.

The question here is whether the tip was sufficiently reliable to justify a <u>Terry</u> stop of the Defendant.  Here, as in <u>J.L.</u>, an informant provided the information that led to the stop.  Here, as in <u>J.L.</u>, the informant's tip provided only information about the race of the suspect (Indian) and what he was wearing (Black leather coat; hairnet).  Here, as in <u>J.L.</u>, and unlike in <u>White</u>, there was no predictive behavior included in the tip that the police could corroborate to establish independently, the reliability of the tip.  Observing an African-American, two blocks away from the place where the informant said an Indian was carrying a gun the day before, the police officers surrounded the defendant and handcuffed him before they asked him any questions.  The Supreme Court's opinion in <u>J.L.</u> compels the conclusion that the informant's tip here was not sufficiently reliable to justify

9

a Terry stop of the Defendant.

The Government argues that the informant in this case, unlike the informant in J.L., was not an anonymous informant. The 9-1-1 caller here identified himself as "Carlos" and provided the 9-1-1 dispatcher with a telephone number. The informant here, for all analytical purposes, was anonymous because the officers did not know anything about Carlos, they did not know whether Carlos was reliable, and they did not have any information about how Carlos came to know that the man at the light rail station was carrying a firearm. Carlos is exactly like the anonymous informant in J.L. He "lacked the moderate indicia of reliability present in White" and the indicia of reliability required by Illinois v. Gates, 462 U.S. 213 (1983). Id. at 271.

The unreliability of the tip here is underscored by its staleness and the inconsistency between the information in the tip and the observations the policemen say led them to conclude that Defendant was the man described by Carlos. The police officers here detained Defendant, not near in time to the issuance of the dispatch report, but the next day. Moreover, the tip described an "Indian." The tipster did not elaborate whether he meant someone from India, or an "American Indian." Defendant is neither. He appears to the Court to be an African American, and was described by Officer Dubay as "possibly mixed race." The tip described a man in a black leather trench coat. Officer Dubay testified Defendant wore a black jacket. The only point of congruence between the defendant and the tip was that, like the man described by Carlos, Defendant wore a hairnet.

Like the officers in J.L. the officers here did not possess reasonable, articulable suspicion to stop Defendant based solely on the tip of an unknown informant "who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about"

Defendant. Id. at 271.

The Government's effort to distinguish this case from J.L. is unavailing. The Government argues that, once the officers stopped their car, Defendant "looked at Officer Dubay with an expression 'like uh-oh' and quickly walked into the bookstore." (Gov's Mem. in Opp. at 6.) The Government points out that, once Officer Dubay followed Defendant into the bookstore, Defendant "had turned and looked back at Officer Dubay over the tops of bookshelves." (Gov's Mem. in Opp. at 6.) The Government argues that this "evasive and unusual behavior" justified the officers in detaining Defendant by placing him in handcuffs. (Gov's Mem. in Opp. at 6.)

The Court rejects the Government's characterization of Defendant's conduct. The Defendant's decision to walk quickly away from the approaching police officers and enter the nearby bookstore in the heart of downtown Minneapolis would appear to be an exercise of his right, recognized in Florida v. Royer, 460 U.S. 491, 498 (1983), to ignore the approaching police and go about his business. Such "refusal, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991).

The Court's conclusion in this regard is underscored by the Defendant's conduct once inside the bookstore. Unlike the unprovoked flight in a high crime neighborhood that was at issue in United States v. Wardlow, 528 U.S. 119 (2000), Defendant here stopped and looked back at the approaching police over the bookshelves. After they handcuffed him in the middle of the busy bookstore he, not unreasonably asked, why they had stopped him.

The Court concludes that the day old tip, about an Indian with a gun two blocks away from where the African-American, or mixed race, Defendant was seized, adds nothing to the conduct the Government now contends justified the stop.

As there was no reasonable suspicion to warrant even a Terry stop under the circumstances of the present case, the Court need not decide whether Officers Dubay and Subject exceeded the scope of a Terry stop when they detained and handcuffed Defendant in the bookstore without first asking him a single question. As there was no reasonable suspicion, the Terry stop was without justification and the Fourth Amendment compels the suppression of all of the fruits of this Fourth Amendment violation. This includes the gun itself as well as all three sets of statements defendant made. As all of the defendants statements must be suppressed as the fruits of the Fourth Amendment violation, the Court does not need to separately decide whether the statements are also the product of any Fifth Amendment violation. See generally Brown v. Illinois, 422 U.S. 590 (1975).

### III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to quash arrest [#17] and Defendant's Motion to suppress confessions or statements in the nature of confessions [#22] be **GRANTED** and that all fruits of the Terry stop, including the firearm seized and all statements made by Defendant, be suppressed.

DATED: March 27, 2006                           s/ *Franklin L. Noel*
                                                                 FRANKLIN L. NOEL
                                                                 United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **April 12, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and

Recommendation, the party making the objections shall timely order and cause to be filed by **April 12, 2006,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.